RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 21a0180p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

ST. LUKE'S HOSPITAL d/b/a McLaren St. Luke's;
WELLCARE PHYSICIANS GROUP, LLC,

        *Plaintiffs-Appellees*,

    *v.*

PROMEDICA HEALTH SYSTEM, INC.; PROMEDICA
INSURANCE CORPORATION; PARAMOUNT CARE, INC.;
PARAMOUNT CARE OF MICHIGAN, INC.; PARAMOUNT
INSURANCE COMPANY; PARAMOUNT PREFERRED
OPTIONS, INC.,

        *Defendants-Appellants*.

No. 21-3007

───────────────

Appeal from the United States District Court for the Northern District of Ohio at Toledo.
No. 3:20-cv-02533—Jack Zouhary, District Judge.

Argued: July 29, 2021

Decided and Filed: August 10, 2021

Before: SUTTON, Chief Judge; COLE and READLER, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Douglas E. Litvack, Christopher G. Renner, David M. Gossett, DAVIS WRIGHT TREMAINE, LLP, Washington, D.C., for Appellants. David A. Ettinger, HONIGMAN LLP, Detroit, Michigan, for Appellees. **ON BRIEF:** Douglas E. Litvack, Christopher G. Renner, David M. Gossett, DAVIS WRIGHT TREMAINE, LLP, Washington, D.C., Adam S. Sieff, DAVIS WRIGHT TREMAINE LLP, Los Angeles, California, Mark D. Wagoner, Matthew T. Kemp, Larry J. Obhof, SHUMAKER, LOOP & KENDRICK LLP, Toledo, Ohio, for Appellants. David A. Ettinger, HONIGMAN LLP, Detroit, Michigan, Ron N. Sklar, HONIGMAN LLP, Chicago, Illinois, Denise M. Hasbrook, ROETZEL & ANDRESS, Toledo, Ohio, for Appellees. Amanda L. Wait, Victor J. Domen, Jr., NORTON ROSE FULBRIGHT US LLP, Washington, D.C., Gerald A. Stein, NORTON ROSE FULBRIGHT US LLP, New York, New York, David E. Dahlquist, Kevin P. Simpson, WINSTON & STRAWN LLP, Chicago, Illinois for Amici Curiae.

———————————

**OPINION**

———————————

SUTTON, Chief Judge.  In phase one of this dispute, our court affirmed the Federal Trade Commission's decision to block a merger of ProMedica Health System and St. Luke's Hospital in Lucas County, Ohio.  As part of the unwinding of the merger, ProMedica and St. Luke's signed an agreement in which ProMedica's insurance subsidiary, Paramount, agreed to maintain St. Luke's as a within-network provider.  But that contractual obligation came with a caveat:  Paramount could drop St. Luke's if ownership of the hospital changed.  The qualification came to fruition when a large healthcare company based in Michigan, McLaren Health, merged with St. Luke's.  In response, Paramount ended its relationship with St. Luke's, removing the hospital from its provider network.

All of this prompted a second antitrust charge against ProMedica, this one by St. Luke's.  It alleged that ProMedica's refusal to do business with it violated the antitrust laws.  The district court preliminarily enjoined ProMedica from pulling the plug on the agreement.  Because ProMedica had a legitimate business explanation for ending the relationship, St. Luke's is unlikely to show that ProMedica unlawfully refused to continue doing business with it.  On top of that, it has little likelihood of establishing an irreparable injury given the option of money damages.  For these reasons and those elaborated below, we vacate the preliminary injunction.

I.

A.

Typical economic transactions involve single buyers and single sellers and a straightforward price.  Not so in the healthcare market.  It includes a diverse cast of players for each treatment and variable, often unknown, prices.

Take account of the many potential sellers:  individual doctors, physician practices, pharmacies, hospitals, and others.  So too of buyers.  Rarely is there just one of them, with state and federal governments, private insurance companies, and individuals all participating.  Making

matters more complicated, many players often take on more than one role, with healthcare companies and insurance companies frequently acting as sellers and buyers.

Pricing is unique too. Consumers rarely know the cost of any one procedure. And healthcare providers often charge different rates for care depending on who foots the bill. The federal government, for example, tends to pay less for services and procedures than do private insurance plans. Medicare and Medicaid rarely cover "providers' actual cost of services." *ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559, 561 (6th Cir. 2014).

Private health insurance stands in the middle of the healthcare market. Although some patients shop for health insurance on their own, most Americans receive coverage through their employers, a vestige of 1940s wage policies. Atul Gawande, *Is Health Care a Right?*, The New Yorker, Oct. 2, 2017, at 48. Employers thus negotiate rates with commercial insurance companies. If an employer is self-insured, it foots the cost of care itself and pays only administrative fees. If not, the insurance company covers the cost of care in exchange for a premium per covered employee.

Health insurance companies in turn contract with providers to set rates and bundle providers into "networks" that they can then market to employers. When insurance companies include as many providers as possible in their network, that adds flexibility and enhanced choice. But it costs more. When insurance companies include only a subset of providers in a narrow network, the opposite usually is true. An insurer "may be able to negotiate lower rates from providers for narrow network plans," which may then "enable the insurer to offer consumers lower premiums." R.49 at 11. Because narrow networks funnel more patient traffic to their contracted providers, insurance companies pay less for care and pass some of those savings on to employers and patients.

B.

Anchored by underappreciated Toledo, Lucas County has four main hospital systems: ProMedica, Mercy Hospitals, the University of Toledo Medical Center, and St. Luke's. *ProMedica*, 749 F.3d at 562. Two-thirds of Lucas County's patients have insurance through the government. *Id.* at 561. The rest receive insurance through private plans.

ProMedica acts as a healthcare buyer and seller. As a seller, it holds a prominent place in the market. ProMedica's hospital system holds 56% of the county's market for "inpatient general acute care services" that are "offered to commercially insured patients." R.22-4 at 2.

As a buyer, ProMedica has a more modest position. It offers health insurance through a subsidiary, Paramount, which purchases healthcare from providers. Rather than include many hospitals in its network, Paramount employs a narrow-network strategy that steers patients toward ProMedica's hospitals. This vertically integrated approach allows Paramount to lower prices and permits ProMedica to recoup those savings down the line as a provider. Far from dominant in this market, Paramount competes alongside national insurers like Aetna and Anthem and regional insurers like Buckeye Insurance Group and Medical Mutual of Ohio. Paramount has "about 78,000 commercial members and fewer than 20,000 Medicare Advantage members" in the region. R.40 at 6.

St. Luke's, a healthcare seller located southwest of Toledo in the city of Maumee, has a smaller market share. Until recently, it operated as an independent community hospital, capturing roughly 10% of the local commercial market. *ProMedica*, 749 F.3d at 562. Mercy and the University make up the remainder.

Despite its size, St. Luke's has some comparative advantages. It offers premium care at competitive rates. And it operates in the wealthier southwestern portion of Lucas County, attracting a large number of privately insured patients. Those patients represent a critical revenue source for St. Luke's, offsetting the losses incurred from treating patients covered by government plans.

These twin advantages help to explain why ProMedica sought to merge with St. Luke's in 2010. After agreeing to join forces, ProMedica sought to integrate St. Luke's operation by melding back offices and transferring employees. Paramount, ProMedica's insurance arm, contracted with St. Luke's around this time to include the hospital as an in-network provider. The partnership proved lucrative. Paramount won over "major employers in the areas most served by St. Luke's," gaining over 10,000 covered individuals after adding St. Luke's to its

provider network.  R.22-7 at 2.  ProMedica also continued to work with WellCare, the St. Luke's physician group.

Wary of ProMedica's market dominance and concerned about the downstream effects of market consolidation, the Federal Trade Commission objected to the merger.  *ProMedica*, 749 F.3d 559.  After an investigation, the Commission ordered ProMedica to divest St. Luke's.  *ProMedica Health Sys., Inc.*, 2012-1 Trade Cas. 77840, 2012 WL 1155392, at *48 (F.T.C. Mar. 28, 2012).  Our court rejected ProMedica's petition to overturn the order.  *ProMedica*, 749 F.3d at 561.

## C.

That brings us to the second, perhaps final, phase of this dispute.  In 2016, the parties negotiated, and the Commission approved, a divestiture agreement establishing that Paramount would continue contracting with St. Luke's as an in-network healthcare provider.  But the provision contained an out.  If St. Luke's underwent "a Change in Control," Paramount could "immediately terminate" its contracts with the hospital and its physician group.  R.32 at 19.

The arrangement initially worked well, so well that the parties re-upped the "mutually beneficial" contract two years later, extending it through 2023.  R.22-8 at 2.  For St. Luke's, the agreement guaranteed a steady stream of traffic from patients with Paramount insurance in the wealthier southwestern portion of the county.

Paramount benefited as well in obvious and not-so-obvious ways.  The obvious:  It could advertise St. Luke's as an in-network provider to private insurance customers, an easy way to boost revenue.  The not-so-obvious:  ProMedica generated revenue from patients who needed advanced care that St. Luke's could not provide.  Keep in mind that not every hospital provides every kind of service.  St. Luke's offers just primary and secondary services (think "basic medical and surgical" care), while ProMedica offers more sophisticated tertiary services like cardiothoracic surgeries and advanced cancer care.  R.32 at 65.  By maintaining St. Luke's as an in-network provider, Paramount could attract members who might go to St. Luke's for basic services but move to ProMedica's hospitals for more complex treatment.  St. Luke's also allowed

ProMedica to operate a cancer center on St. Luke's campus, giving ProMedica an "access point" in southwestern Lucas County.  R.44 at 3.

This picture changed when McLaren Health Systems agreed to buy St. Luke's in October 2020.  A large healthcare provider itself, McLaren "agreed to commit to at least $100 million in a capital investment in St. Luke's."  R.22-5 at 2.  ProMedica viewed McLaren St. Luke's as "a completely different type of competitor."  R.43 at 2.  McLaren offers complex cancer services that "compete directly" with ProMedica and could siphon off patients needing advanced care from ProMedica's hospitals.  R.44 at 5.

With these considerations in mind, ProMedica ended its relationship with St. Luke's. The day after McLaren finalized its acquisition of St. Luke's, ProMedica terminated several agreements, including Paramount's agreement to include St. Luke's as an in-network provider and the ongoing relationship between ProMedica and the WellCare physician group at St. Luke's.

St. Luke's sued ProMedica, alleging that, by refusing to continue the contract, ProMedica violated the Sherman Act—mainly § 2 of the Act.  St. Luke's also sought a preliminary injunction to prevent ProMedica from canceling its contracts with the hospital.  ProMedica opposed the request for an injunction and filed a motion to dismiss the case.  The district court denied ProMedica's motion to dismiss and granted St. Luke's motion for a preliminary injunction.

II.

A.

Four factors guide our review of a district court's preliminary injunction:  (1) the likelihood of success on the merits, (2) the threat of irreparable harm absent an injunction, (3) the risk of harm to others, and (4) the broader public interest.  *A1 Diabetes & Med. Supply v. Azar*, 937 F.3d 613, 618 (6th Cir. 2019).  In this case, those inquiries largely boil down to two. Because St. Luke's has little chance of success on its antitrust claims and because St. Luke's has

failed to establish a risk of irreparable harm, the district court should not have preliminarily enjoined ProMedica's termination of the contracts.

Section 2 of the Sherman Act makes it illegal to "monopolize, or attempt to monopolize . . . any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2. By themselves, "possessing monopoly power and charging monopoly prices" do "not violate § 2." *Pac. Bell Tel. Co. v. linkLine Comms., Inc.*, 555 U.S. 438, 447–48 (2009). The Act targets "the possession of monopoly power" coupled with "the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966). The focus is on guarding the competitive process and on protecting the welfare of consumers, not on ensuring the economic fortunes of competitors. A monopolist's actions thus must "harm the competitive *process* and thereby harm consumers," as mere "harm to one or more *competitors* will not suffice." *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001) (per curiam).

In some settings, § 2 of the Sherman Act prohibits a company from refusing to contract —from "refusing to deal"—with another company. Just as the statute prohibits two companies from entering a contract that permits an anticompetitive monopoly, so it also prohibits a company from refusing to deal with another company in aid of such practices. Even so, refusal-to-deal claims face a steep and obstacle-laden climb. Courts start with the liberty-based assumption that individuals and companies may do business with whomever they please. "As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." *linkLine*, 555 U.S. at 448. This "presumption of freedom" has deep roots. Robert H. Bork, *The Antitrust Paradox* 344 (1978). Even the earliest § 2 cases note that the Sherman Act "does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919).

But generally and traditionally are not always and forever. Under discrete circumstances, "a refusal to cooperate with rivals can constitute anticompetitive conduct and violate § 2."

*Verizon Comms. Inc. v. Law Offs. of Curtis Trinko*, 540 U.S. 398, 408 (2004). The course of liability requires a showing that the "monopolist's conduct" is "irrational but for its anticompetitive effect." *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1075 (10th Cir. 2013) (Gorsuch, J.); *see also Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 462 (7th Cir. 2020). Because separating "anticompetitive malice" from "competitive zeal" tries the most acute and fair-minded judges and because there is a rational explanation for most business conduct, far more claims are lost than won on this ground. *Trinko*, 540 U.S. at 409. "[A]s generalists, as lawyers, and as outsiders trying to understand intricate business relationships," judges have "limitations" in gauging when a refusal to deal will hurt competition as opposed to the expectations of a single competitor. *Nat'l Collegiate Athletic Ass'n v. Alston*, 141 S. Ct. 2141, 2166 (2021).

A few questions inform the inquiry. Did the monopolist enter a "voluntary . . . course of dealing" with its rival? *Trinko*, 540 U.S. at 409. Did the monopolist willingly sacrifice "short-run benefits . . . in exchange for a perceived long-run impact on its smaller rival"? *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 611 (1985); *see also* 3 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 651 (4th ed. 2015). If so, did the monopolist ignore "efficiency concerns," *Aspen Skiing*, 472 U.S. at 610, or act without "valid business reasons," *id.* at 605? Answering "yes" to the above questions signals a potential § 2 problem. Answering "no" to any of them signals that the antitrust laws do not apply. *Novell*, 731 F.3d at 1074–75; *see also FTC v. Qualcomm Inc.*, 969 F.3d 974, 993–94 (9th Cir. 2020); *New York v. Facebook*, No. 20-3589, 2021 WL 2643724, at *11 (D.D.C. June 28, 2021).

B.

One impediment to St. Luke's refusal-to-deal claim is that the parties' prior course of dealings demonstrates that ProMedica had a valid business reason for ending the contract. ProMedica and St. Luke's, and the Federal Trade Commission to boot, anticipated the possibility that St. Luke's might merge with another healthcare company, and as a result they agreed to give ProMedica the right to end the contract with St. Luke's under those circumstances. The "Change in Control" provision in the divestiture agreement—a contract St. Luke's signed and the Commission approved—allowed ProMedica to "immediately terminate" its ongoing arrangement

with St. Luke's if St. Luke's were acquired. R.32 at 19. Possibilities became realities when McLaren acquired St. Luke's, and ProMedica exercised the contractual right St. Luke's gave it. St. Luke's knew from the beginning that its ability to maintain its status as an in-network provider might be affected if it were acquired by another company. The deal between ProMedica and St. Luke's was predicated upon the latter's status at the time of the contract. The two firms may have entered a "voluntary . . . course of dealing" in one sense, *Trinko*, 540 U.S. at 409, but it included a voluntary, mutually agreed, and government-approved basis for ending that course of dealing. In other words, ProMedica had a legitimate business reason from the outset to end this arrangement, as evidenced by the "Change in Control" clause.

In addition to this pre-approved exit ramp, other factors used to assess refusal-to-deal claims favor ProMedica's right to end Paramount's relationship with St. Luke's. Start by asking whether the evidence signals that ProMedica willingly forsook "short-term profits" by pulling out of its agreements. *Id.* Considerable record evidence shows how ProMedica could benefit from encouraging patients to seek care at ProMedica hospitals and from ProMedica's doctors rather than at St. Luke's and by extension at McLaren. Steve Cavanaugh, ProMedica's Chief Financial Officer, explained that after McLaren's acquisition, St. Luke's began offering "advanced care at McLaren hospitals" by "hundreds of specialists and primary care physicians." R.43 at 2–3. Those changes made "St. Luke's a completely different type of competitor," *id.* at 2, and the ProMedica system would "lose revenue if . . . forced to contract with McLaren," *id.* at 5. Others echoed the point, explaining that ending the relationship with St. Luke's would "bring revenue back to ProMedica," R.41 at 12, by ensuring that patients are "treated by ProMedica providers," R.47 at 8.

The one economist to analyze the market shared this perspective. He concluded that for "both commercial members and Medicare Advantage members, the increases in profit from ProMedica treating patients instead of St. Luke's likely are greater than the decreases in profit from lost Paramount enrollment." R.49 at 18.

Nothing in the record establishes that Paramount would suffer serious losses by cutting St. Luke's loose from its provider network. Paramount found that it did "not need St. Luke's in its network to offer an attractive plan to local employers." R.43 at 5. It suffered only "nominal"

membership losses after canceling its in-network agreement with St. Luke's, and the decision produced "no material impact" on the bottom line. R.42 at 4. The only customer Paramount seems to have lost is St. Luke's itself, whose employees were insured through Paramount prior to McLaren's acquisition. Even if Paramount suffered limited losses by eliminating St. Luke's from its provider network, ProMedica reasoned that it would make up the difference by capturing more advanced-care patients who might otherwise go to McLaren for treatment.

Cancer care offers a good example of how the terrain shifted under ProMedica's feet once McLaren entered the scene. According to Dr. Lee Hammerling, ProMedica's Chief Academic Officer, ProMedica agreed to extend Paramount's in-network contract with St. Luke's "[i]n return" for a promise by St. Luke's to extend ProMedica's cancer center lease on the St. Luke's campus and to refrain from opening "a competing cancer center within five miles." R.44 at 4. But once McLaren purchased St. Luke's, it became likely that ProMedica's cancer center would take a hit. Hammerling expected "McLaren St. Luke's" to "begin referring its cancer patients" to McLaren facilities rather than to ProMedica. *Id.* at 5. Other ProMedica leaders expressed similar fears, exacerbated by the possibility that McLaren would open "a joint cancer center across from" St. Luke's. R.47 at 7. Cancer care captures the economic challenge ProMedica faced once St. Luke's became McLaren St. Luke's.

McLaren scrambled ProMedica's approach. Even if ProMedica and St. Luke's entered a "voluntary . . . course of dealing," *Trinko*, 540 U.S. at 409, the facts before us do not show that ProMedica willingly surrendered "short-run benefits" to undercut St. Luke's, *Aspen Skiing*, 472 U.S. at 611.

The answer to this last question takes us part of the way to answering the next question: Did ProMedica offer a "valid business reason" for its decision to cancel its ongoing contracts with McLaren St. Luke's? *Id.* at 599. St. Luke's, all agree, is no longer the "independent community hospital" we encountered in 2014. *ProMedica*, 749 F.3d at 561. McLaren has promised to invest $100 million into St. Luke's and "to assume $65 million of St. Luke's debt and $55 million of St. Luke's pension liability." R.22-5 at 2. Along with a capital infusion, McLaren has brought to the table facilities and healthcare offerings likely to siphon patient revenue from ProMedica. We cannot say ProMedica lacked "legitimate business purposes" in

refusing to continue its contracts with a different competitor.   3B Areeda & Hovenkamp, *Antitrust Law* ¶ 772.

ProMedica did what many companies do when circumstances change.  Reassessing the landscape after McLaren's acquisition is hardly "irrational but for its anticompetitive effect." *Novell*, 731 F.3d at 1075.  A prior decision "to adopt one business model" did "not lock" ProMedica "into that approach and preclude adoption of" a different approach "at a later time." *Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1196 (10th Cir. 2009).  That is hardly an unusual approach in the world of business or economics.  "When my information changes," John Maynard Keynes reputedly quipped, "I change my mind.  What do you do?"  In a competitive market, businesses that do not tack when economic winds change are doomed to fail. The antitrust laws promote competition, not sclerosis.

Recall as well the relevant markets.  While St. Luke's wishes to focus on ProMedica's 56% market share, it overlooks the reality that this refusal to deal involves ProMedica's insurance arm, Paramount.  It is Paramount after all that removed St. Luke's from its provider network.  Paramount has just a 17% market share in the relevant medical insurance market and must compete with the likes of Anthem, Aetna, Buckeye Insurance, Medical Mutual, and others. In this context, it is difficult to maintain that Paramount's contractually permitted refusal to deal will lead to any anticompetitive monopolies.

We also remain wary of differentiating the effects on the market between refusals to deal and mandates to deal, between facilitating competition and forcing cooperation.  Forcing rivals to share—to continue doing business together—pushes the bounds of our expertise, and "[w]hen it comes to fashioning an antitrust remedy" in this area, "caution is key." *Alston*, 141 S. Ct. at 2166.  If the record before us makes anything clear, it is that there is more change than continuity in the Toledo healthcare market.  McLaren's entry into the market and capital infusions promise to alter products and services, and many ineffable incentives along the way.  "[C]entral planners" we are not. *Trinko*, 540 U.S. at 408.

Although our estimation of St. Luke's chance of success anchors our decision, another preliminary injunction factor bolsters it.  As a general matter, a "plaintiff's harm from the denial

of a preliminary injunction" does not count as "irreparable" if it is, or can be, "fully compensable by monetary damages." *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002); *see Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 572 U.S. 1301, 1301–02 (2014) (Roberts, C.J., in chambers). St. Luke's fails to meet that bar. Its complaint primarily emphasizes the loss of patients and market share. But economists can and do assess such injuries in monetary terms. Confirming the point, St. Luke's has asked for damages addressing those very losses. As for its other alleged less tangible economic injuries—harm to reputation and goodwill—they do not suffice at this fledgling stage of the case to warrant the rare remedy of forcing someone to do business with a competitor. Even in *Aspen Skiing*, it was the district court, not the Supreme Court, that granted an injunction, 472 U.S. at 598 n.23, and it did so only after a jury trial on the merits. In this instance, St. Luke's has not shown that money damages would fail to compensate any antitrust injuries.

Other dynamics also give us pause. If Paramount's members in the southwestern portion of the county wish to go to St. Luke's as an in-network provider, they can push their employers to change course when businesses craft their health insurance plans for the upcoming enrollment season. St. Luke's has already advocated such an approach by publishing an open letter "urg[ing]" Paramount members "to consider choosing a plan that includes" St. Luke's and its physicians. R.22-18 at 2.

## C.

St. Luke's hammers one chord in particular in rebuttal, the Supreme Court's decision in *Aspen Skiing*. But that case is "at or near the outer boundary of § 2 liability," *Trinko*, 540 U.S. at 409, and it does not apply by its own reasoning. *Aspen Skiing* involved a dispute between the defendant (a dominant ski resort that controlled three of four mountains in the area) and the plaintiff (a diminutive rival in control of the fourth mountain). 472 U.S. at 587–98. The two rivals had teamed up to offer a joint pass for skiers hoping to use all four mountains. *Id.* at 589–91. After the defendant cut off the joint ticket offering, the plaintiff "tried a variety of increasingly desperate measures to re-create the joint ticket, even to the point of in effect offering to buy the defendant's tickets at retail price." *Trinko*, 540 U.S. at 409. The district court compelled the two to continue to offer a joint ticket, and on review the Supreme Court reasoned

that the dominant resort failed "to offer any efficiency justification whatever for its pattern of conduct." *Aspen Skiing*, 472 U.S. at 608.

*Aspen Skiing* differs from today's case in more ways than one. ProMedica *has* offered an "efficiency justification" for its decision to back out of its agreements with St. Luke's. McLaren's acquisition changed the economic calculus of the prior relationship and prompted a course correction grounded in financial realities, not "anticompetitive malice." *Trinko*, 540 U.S. at 409. By the same token, ProMedica did not act solely to "avoid providing any benefit" to St. Luke's, *Aspen Skiing*, 472 U.S. at 610, but advanced its own interests as a competitor in the market. Imagine how *Aspen Skiing* would have turned out if the large resort made these decisions only after the small resort merged with another large resort. Such a different explanation for ending their cooperation, it is fair to think, would have led to a different outcome. A contrary approach might even have led to inklings of an antitrust *conspiracy* charge. Last, but hardly least, *Aspen Skiing* did not involve a preexisting agreement that permitted the resort to end its ongoing contracts. *Christy Sports*, 555 F.3d at 1196. The more one compares the two situations, the less flattering the comparison becomes to St. Luke's.

Also unhelpful is *Otter Tail Power Co. v. United States*, 410 U.S. 366 (1973). It concerned an electric utility's refusal to sell power at wholesale prices to municipalities. *Id.* at 371. The Court held that the utility violated § 2 by refusing to contract with certain cities, explaining that "[i]nterconnection with other utilities is frequently the only solution" to "the difficulties and problems of . . . isolated electric power systems" and that the utility refused to sell power "solely to prevent municipal power systems from eroding its monopolistic position." *Id.* at 378. Unlike municipalities hoping to buy power, McLaren St. Luke's does not depend wholly on ProMedica for treating patients as a healthcare provider. Other insurance companies continue to include St. Luke's as an in-network provider. The hospital can tell patients, indeed it already has told patients, to switch to those plans if they wish to continue going to St. Luke's for care. More, McLaren can enter the healthcare market and offer its own insurance plan to compete alongside Paramount's narrow network. Unlike industries requiring extensive infrastructure, new firms can easily enter the "market for medical insurance." *Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins. Inc.*, 784 F.2d 1325, 1335 (7th Cir. 1986).

*Otter Tail* and *Aspen Skiing* each concerned small competitors that could not survive without the monopolist's help. By refusing to deal, the monopolists could starve their emaciated rivals out of the market. Thanks to McLaren, St. Luke's occupies a far different position. As in *Aspen Skiing*, the defendants in *Otter Tail* could not offer an efficiency rationale explaining their conduct. *See* Bork, *The Antitrust Paradox*, at 346. ProMedica has by contrast given sound explanations for refusing to continue dealing with its new, much larger rival: McLaren St. Luke's.

The district court's preliminary findings do not alter this conclusion. Because Paramount and St. Luke's renewed their contractual relationship in 2018 to run through 2023 and because Paramount's president said that including St. Luke's made Paramount "more attractive to employers," R.68 at 10, the district court thought it "abundantly clear" that ProMedica "would not suffer harm from a short-term continuation of these agreements," *id.* at 11. But the same contract, even as continued, permitted ProMedica to cancel it if St. Luke's were acquired. That cancellation option makes it difficult to draw the conclusion, factually or otherwise, that ProMedica necessarily would benefit financially from continuing the contract. By *all* of its terms, the contract would benefit ProMedica only as long as St. Luke's did not merge—and especially did not merge with an equal-sized competitor. The reality that ProMedica did not enter an unconditional five-year relationship with St. Luke's undermines the district court's conclusion that ProMedica would not suffer by continuing its relationship with St. Luke's, and it sets this case apart from the kind of refusal-to-deal claim *Aspen Skiing* allowed. *Christy Sports*, 555 F.3d at 1196–97.

St. Luke's insists that, because ProMedica *intended* to harm its economic prospects, ProMedica's conduct violates § 2. To bolster the charge, St. Luke's emphasizes that ProMedica lacked any business justification to cancel its contracts with St. Luke's physician group as well as its contract with Paramount. This WellCare cancellation, St. Luke's thinks, shows that ProMedica acted only out of spite. But the markets for physician services and for general acute care are distinct, and the complaint targets the latter. More fundamentally, harming a competitor, even wishing to harm a competitor, by itself falls short of what § 2 requires. *Microsoft*, 253 F.3d at 58; *see also Facebook*, 2021 WL 2643724, at *11 (requiring more than "an intent to harm" to

state a refusal-to-deal claim). Every shrewd businessperson, and every athlete and politician to boot, intends to beat her competitors. Just so for companies, the most strategic of which hope to squash the competition by delivering a superior product. "The mere possession of monopoly power . . . is not only not unlawful; it is an important element of the free-market system," for "[t]he opportunity to charge monopoly prices—at least for a short period—is what attracts 'business acumen' in the first place." *Trinko*, 540 U.S. at 407. That ProMedica might want to beat McLaren St. Luke's by delivering less expensive, vertically integrated healthcare in Lucas County is not a sign of market forces failing. It is just the opposite.

Antitrust law, remember, concerns itself "with the protection of competition, not competitors." *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962); *Energy Conversion Devices Liquidation Tr. v. Trina Solar Ltd.*, 833 F.3d 680, 682 (6th Cir. 2016). True enough, Paramount's decision to cancel its contract with St. Luke's means that McLaren St. Luke's may see fewer patients—and thereby earn less revenue—in the short run. Competition is, after all, "a ruthless process." *Ball Mem'l*, 784 F.2d at 1338. Yet "the antitrust laws are not balm for rivals' wounds." *Id.* McLaren has its chance to compete in Lucas County by introducing new health insurance plans and by attracting Paramount members who may want the option to visit St. Luke's as an in-network provider. Forcing ProMedica to continue dealing with St. Luke's may even lessen incentives to compete—that's what happens with some antitrust conspiracies—an outcome antithetical to a central aim of antitrust law.

Switching gears, St. Luke's alleges a violation of § 1 of the Sherman Act, arguing that the "change in control provision in the divestiture agreement is anticompetitive and an illegal restraint of trade." R.1 at 60. We fail to see how. Section 1 makes "[e]very contract . . . in restraint of trade or commerce among the several States . . . illegal." 15 U.S.C. § 1. The "Change in Control" provision does not restrain trade; it does the opposite by allowing one party to back out of a cooperative venture in view of changed business circumstances. St. Luke's cannot "use the antitrust laws to sue a rival merely for vigorous or intensified competition." *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 450 (6th Cir. 2007) (en banc). Even if we were to subject the "Change in Control" provision to rule-of-reason analysis, St. Luke's has failed to meet its "initial burden to prove that the challenged restraint has a substantial anticompetitive

effect." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018). The provision at issue here allows ProMedica to compete more directly with McLaren St. Luke's. Promoting competition is what the antitrust laws seek to achieve, not what they seek to halt.

Surely St. Luke's does not suggest the divestiture agreement *itself* violated § 1, for that would mean St. Luke's broke the antitrust laws by agreeing to it. Remember too that the Commission blessed the arrangement. How, then, does a provision allowing one party to back out of the arrangement restrain trade? St. Luke's offers no answer. Its arguments boil down to an assertion that ProMedica acted unilaterally to monopolize the market. "If that allegation states an antitrust claim at all, it does so under § 2." *Trinko*, 540 U.S. at 407.

St. Luke's adds that ProMedica is "even more dominant today than in 2010, when the Commission and this Court found that ProMedica's efforts to eliminate competition with St. Luke's through a merger would be anticompetitive." Appellee's Br. at 15. But it is one thing for the Federal Trade Commission to stop a merger. It is quite another to force two rivals to continue to do business together even after both parties to the contract agreed they could end the relationship after a change in control. "If the law were to make a habit of forcing monopolists to help competitors . . . courts would paradoxically risk encouraging collusion between rivals." *Novell*, 731 F.3d at 1073.

The discerning reader might wonder whether St. Luke's complaint has established antitrust standing. We have said that an antitrust plaintiff must "do more" than merely allege harm flowing from antitrust violations to meet the freestanding antitrust standing requirement. *NicSand*, 507 F.3d at 449. It must also show that the loss "stems from a competition-*reducing* aspect or effect of the defendant's behavior." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990). As we have made clear, a plaintiff must seek to defend "marketplace competition" and not merely allege harm to its "capacity as a competitor." *Indeck Energy Servs., Inc. v. Consumers Energy Co.*, 250 F.3d 972, 977 (6th Cir. 2000). One might fairly wonder whether St. Luke's meets the bar, particularly because ProMedica's exercise of its contractual right seemingly promotes, rather than hampers, competition for general acute care services in the Toledo area. But we need not decide the question. We have before us only the district court's

decision to grant a preliminary injunction. And antitrust standing—or the lack thereof—does not affect our jurisdiction to consider that issue. *NicSand*, 507 F.3d at 449.

ProMedica separately appeals the district court's decision not to award a bond pending this appeal. As both parties agree, the issue is moot in view of our decision to vacate the preliminary injunction.

St. Luke's tries to cast this narrative as a David versus Goliath story, forgetting that David competed ably in the end. Even on its own terms, the theory that ProMedica has long dominated the market and that its cancellation of the Paramount contracts is just one more mile marker on its road to monopolization does not work. As time has shown, St. Luke's has survived long enough to take on gigantic qualities of its own. The new *McLaren* St. Luke's by every measure is well-resourced and well-positioned to compete with ProMedica. If anything, ProMedica's cancellation may well prompt McLaren to enter the market sooner, and with more vigor, than it otherwise would. Our economic system and the antitrust laws are premised on the assumption that consumers will be better off for it.

We vacate the preliminary injunction.