NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0102n.06

No. 21-5617

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

COMPREHENSIVE SECURITY, INC.; ASSOCIATED PROTECTIVE SERVICE, INC.; ONTRAC SECURITY, INC.,

    Plaintiffs-Appellants,

v.

METROPOLITAN GOVERNMENT OF NASHVILLE & DAVIDSON COUNTY, TENNESSEE,

    Defendant-Appellee.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**FILED**
Mar 07, 2022
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE

OPINION

Before: McKEAGUE, STRANCH, and BUSH, Circuit Judges.

**JANE B. STRANCH, Circuit Judge.** This antitrust case concerns the Metropolitan Nashville Police Department's (MNPD) entry into private security services in Davidson County, Tennessee. Prior to 2013, private security services companies routinely hired off-duty MNPD officers to staff their commitments to provide security services. The MNPD eventually stopped permitting its officers to accept secondary employment opportunities and entered the private security services market, winning several contracts previously held by other companies. Three private security services companies sued, claiming violations of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2. Following a bench trial, the district court held that no antitrust violations occurred and entered judgment for Defendant. For the reasons that follow, we **AFFIRM**.

## I.  BACKGROUND

### A.  Factual Background

We begin with the district court's clearly stated findings of fact.  Comprehensive Security, Inc., Associated Protective Service, Inc., and OnTrac Security, Inc. (the Companies), are three private security services companies that operate in Davidson County, Tennessee.  They offer policing and security services to the public, including site security, asset security, traffic control, crowd control, and individual protection, among other services.  Prior to 2013, the Companies routinely hired off-duty police officers who worked for MNPD or other state or local government law enforcement agencies as part-time employees and on an as-needed basis.  Those officers received their benefits and training by virtue of their regular employment, so the Companies incurred virtually no training cost or other expense in hiring those individuals.  In addition, many of the off-duty officers are commissioned by the Tennessee Peace Officer Standards & Training Commission (POST officers), which allows those officers to make arrests and direct traffic on public streets—a feature that is important to many event organizers.

Employment of such police officers was available only through MNPD's secondary employment policies and procedures.  By virtue of those practices, an MNPD officer who desired to work part-time for a private security company could submit a secondary employment work request, known as a Form 150, and approval was all but certain.  That process was streamlined in 1997, when MNPD established the "Secondary Employment Unit" (SEU) to facilitate approval of secondary employment requests.  In turn, private securities companies benefited greatly from this accessible pool of qualified labor.  As part of this relationship between MNPD and the Companies, MNPD also allowed private security companies to attend the Special Events Committee, which allowed them to learn about events in the community and "share their expertise on security, road, and traffic control."

In April 2013, then-MNPD Chief Steve Anderson announced a five-year transition plan that would alter these practices. Chief Anderson explained that there was "little or no regulation or oversight as to how, or even where, officers used their police authority in off-duty employment," such that there was "the real potential," as seen elsewhere, "[for] the reality of inappropriate conduct, favoritism, misbehavior, and/or corruption." As a result, Chief Anderson implemented a program that would restrict the ability of MNPD officers to acquire secondary employment by requiring that all private security services work be approved by MNPD. His program was to be implemented over the course of five years, providing time so that there would be no "outcry" over the changes to the system that had long served the Nashville area. Moreover, Chief Anderson also intended that MNPD itself would enter the private security services market by providing its officers to staff community events and explained that he wanted MNPD to "give the Nashville community and event organizers an affordable way to have Metropolitan Nashville police officers staff their events."

MNPD Captain David Corman was the head of SEU from 2010 to 2019 and was charged with carrying out Anderson's five-year transition plan. At first, SEU focused on obtaining private security contracts for MNPD so it could provide opportunities for its officers to staff events. Corman subsequently added more structure and oversight to the Form 150 process, MNPD started requiring multiple levels of approval, and it began its own assessment of whether each private security work opportunity was "worthwhile." It then became more difficult and onerous for officers to obtain Form 150 approvals, forcing the Companies to rely on other sources of labor—namely, non-MNPD officers—to staff their contracts. MNPD also stopped inviting the Companies to the Special Events Committee, instead only allowing them to attend for individual projects, and it began advertising itself as a source of private security services for special event planners.

Between 2013 and 2018, the impact of MPND's entrance into the private security market proved to be significant. The Companies lost several lucrative contracts—including contracts for the annual Iroquois Steeplechase, Nashville Pride Festival, and Nashville Christmas Parade events; events at the Ryman Auditorium and Grand Ole Opry House; work on a day-to-day basis at the TriStar Hospitals; and providing services to the State Fairgrounds—all to MNPD.

On March 2, 2018, Anderson issued a new memorandum, this time ending MNPD's approval of its officers' requests to perform off-duty work for private security companies. The Companies then had to rely solely on non-MNPD officers to staff their private security services contracts. At the same time, MNPD's SEU department was fully operating as a private security company. As noted, MNPD obtained a number of lucrative contracts previously held by the Companies and offered competitive pricing, a departure from its prior practices of offering services at above-market prices. In some cases, however, it offered its services at a discounted rate or even for free.

### B.    Procedural Background

The Companies brought this lawsuit under Section 2 of the Sherman Antitrust Act against the Metropolitan Government of Nashville and Davidson County, Tennessee. The district court held a bench trial, finding in favor of the Government. At trial, in addition to the testimony and documentary evidence that gave rise to the facts in the preceding section, the district court considered the testimony of two expert witnesses pursuant to Federal Rule of Evidence 702: Dr. Gilbert Mathis, Professor Emeritus of Economics at Murray State University (on behalf of the Companies) and Dr. Charles L. Baum II, Professor of Economics at Middle Tennessee University (on behalf of the Metropolitan Government).

Dr. Mathis submitted an expert report and testified, opining that MNPD's conduct reduced the available labor pool needed by the Companies to compete in the private security market. He

concluded that in doing so, MNPD restricted competition and increased its own market power vis-à-vis the Companies. His analysis, moreover, was based on a number of assumptions. First, Dr. Mathis did not include all available off-duty officers, such as officers from surrounding geographic areas that are routinely employed by the Companies. Second, he calculated the "Herfindahl-Hirschman Index" (HHI)—which is a commonly-used measure of market concentration to determine market competitiveness—considering all of the officers in five counties as one unit. And finally, he assumed that MNPD officers *must* be available to the Companies.

The court afforded "little weight" to Dr. Mathis's opinion because it found it "to be flawed due to incomplete analysis." The district court stated that "Dr. Mathis analyzed the wrong market. As credibly explained by Dr. Baum, Dr. Mathis failed to analyze the sell-side market for the supply of private security services that is the basis of Plaintiffs' claim," and compounded that "error by rejecting, contrary to the evidence at trial, that the 'buyers' relevant to private security services are special event planners and organizers." It found that by not including all available off-duty officers from other agencies and geographic areas—particularly because the Companies routinely hire such off-duty officers—Dr. Mathis overestimated MNPD's market power. Similarly, Dr. Mathis's calculation of the HHI was "unreliable," according to the district court, because by considering all of the firms as one entity, "the labor pool 'seems more concentrated than it really is.'" And finally, the district court noted that the assumption that MNPD officers must be available makes little sense because MNPD is not obligated to make its officers available to private security companies at all.

With the above in mind, the district court found that the Companies failed to prove a definition of the relevant market. Even if there was some evidence to suggest they had proven a relevant market—which, based on the claim, could only be the sell-side of the private security market—the court concluded that Dr. Mathis's analysis offers no insight into how his analysis

establishes MNPD's monopoly power. Finally, the district court noted that even assuming that the threshold inquiries regarding monopoly power had been established by a preponderance of the evidence, the Companies still failed to prove that MNPD willfully intended to destroy competition. Accordingly, the court found no basis for relief under Section 2 of the Sherman Act.

The Companies timely appealed.

## II.    DISCUSSION

On appeal, the Companies raise four challenges to the district court's ruling. First, they contend that the court erred in finding plaintiffs had not proven MNPD's anticompetitive conduct and intent. Second, the Companies argue that the court acknowledged that they established a relevant market under the antitrust analysis, but then it inexplicably disregarded that conclusion. The third and fourth challenges are related: both rely on the contention that the Companies proved MNPD's monopoly power through other direct evidence and, in any case, that the evidence adduced at trial established MNPD's market share.

"Following a bench trial, 'we review a district court's factual findings for clear error and its legal conclusions de novo.'" *Acosta v. Cathedral Buffet, Inc.*, 887 F.3d 761, 764 (6th Cir. 2018) (quoting *Muniz-Muniz v. U.S. Border Patrol*, 869 F.3d 442, 444 (6th Cir. 2017).

Under Section 2 of the Sherman Act, it is illegal for entities or individuals to "monopolize, or attempt to monopolize, . . . any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2. The statute mainly concerns "the possession of monopoly power" in combination with "the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966). Indeed, the Sherman Act seeks to "guard[] the competitive process and . . . protect[] the welfare of consumers, not . . .

ensur[e] the economic fortunes of competitors." *St. Luke's Hosp. v. ProMedica Health Sys.*, 8 F.4th 479, 486 (6th Cir. 2021). It therefore follows that "possessing monopoly power and charging monopoly prices" alone do "not violate § 2." *Pac. Bell Tel. Co. v. linkLine Comms, Inc.* 555 U.S. 438, 447–48 (2009). Rather, "[a] monopolist's actions . . . must 'harm the competitive *process* and thereby harm consumers,' as mere 'harm to one or more *competitors* will not suffice.'" *St. Luke's Hosp.*, 8 F.4th at 486 (quoting *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001) (per curiam)) (emphasis in original).

The thrust of a Section 2 claim revolves around the concept of market power. *See, e.g.*, *Byars v. Bluff City News Co.*, 609 F.2d 843, 849 (6th Cir. 1979) ("In a typical section 2 monopolization or attempt to monopolize case, the issues of relevant product market and relevant geographic market are usually hotly contested."); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 274 (2d Cir. 1979) ("The key to analysis, it must be stressed, is the concept of market power."). Accordingly, any claim under Section 2—both monopolization and attempted monopolization—presents a threshold inquiry that requires the plaintiff to (1) "define the relevant . . . markets in which it competes with the alleged monopolizer," and (2) establish actual monopoly power (for monopoly claims) or market strength that approaches monopoly power (for attempted monopolization claims). *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 782 (6th Cir. 2002); *see also Grinnell Corp.*, 384 U.S. at 570 (requiring "the possession of monopoly power in the relevant market" as an element to prove monopolization); *Richter Concrete Corp. v. Hilltop Concrete Corp.*, 691 F.2d 818, 826 (6th Cir. 1982) (requiring that "a firm must possess market strength that approaches monopoly power" to establish liability for attempted monopolization).

Once the threshold inquiry has been established, to succeed on a monopolization claim, a plaintiff must additionally show that the firm willfully acquired, maintained, or used "that power by anti-competitive or exclusionary means as opposed to 'growth or development resulting from a superior product, business acumen, or historic accident,'" *Conwood Co.*, 290 F.3d at 782 (quoting *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 595–96 (1985)), and a general intent to exclude others from the market, *id.* By contrast, attempted monopolization claims only require an additional showing of a "specific intent to 'destroy competition or build a monopoly.'" *Id.* (quoting *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 101 (2d Cir. 1998)).

We begin with analysis of the threshold issues.

## A. Market Definition

As noted, the first part of the threshold inquiry requires plaintiffs to establish the definition of "the relevant product and geographic markets in which [plaintiff] competes with the alleged monopoly." *Conwood Co.*, 290 F.3d at 782. The geographic market is "defined as an 'area of effective competition,'" or in other words, "the locale in which consumers of a product or service can turn for alternative sources of supply." *Re/Max Intern, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1016 (6th Cir. 1999) (quoting *Moore v. Matthews & Co.*, 550 F.2d 1207, 1218 (9th Cir. 1977)). The district court concluded, and the parties do not dispute, that the relevant geographic market here is the Nashville, Davidson County, Tennessee market.

The disagreement between the parties involves whether the Companies established the product or service market. As the Supreme Court emphasized in *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962), the definition of a market focuses on economic realities and industry practice within the product market. The boundaries of the product market "may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate

economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Id.*

We employ the "reasonable interchangeability" standard as the method to define the relevant product or service market. *See White & White, Inc. v. American Hosp. Supply Corp.*, 723 F.2d 495, 500 (6th Cir. 1983). Under that standard, we assess: "(1) the product uses, *i.e.*, whether the substitute products or services can perform the same function, and/or (2) consumer response (cross-elasticity); that is, consumer sensitivity to price levels at which they elect substitutes for the defendant's product or services." *Id.* (alteration in original) (citing *United States v. E.I. DuPont de Nemours & Co.*, 351 U.S. 377 (1956)). This review is highly factual and requires analysis of relevant expert opinion, testimony to understand the dynamics of the product market, and documentary evidence. *See, e.g.*, *Spirit Airlines, Inc. v. Northwest Airlines, Inc.*, 431 F.3d 917, 933–34 (6th Cir. 2005) (relying heavily on the findings of an expert report to parse the precise market definition, in addition to a broad array of other evidence, to determine whether the proposed market presented a separate and distinct market for Section 2 purposes).

The service market proposed by the Companies was "the supply of security services 'that require POST-commissioned officers.'" On appeal, the Companies contend that they established that definition through evidence that showed "there would be public outcry if MNPD forbade its officers from working for private security companies" and the fact that MNPD "removed private security companies' ability to provide a substitute for Metro's services." This does not suffice to establish the relevant market because it does not provide any proof about what services are being sold, what the market concentration is, or what the individual shares of sales are—which are the core inquiries for the market analysis. *See Brown Shoe Co.*, 370 U.S. at 325.

We agree with the district court that the proffered expert witness testimony and report lends no additional help in precisely defining the relevant product market. Dr. Mathis focused his analysis entirely on the labor market effects of MNPD's actions that, he opined, ultimately reduced the available labor market needed by the Companies. But the Companies' claim is not that they lack the available labor to stay in business because of MNPD's actions. They argue that they lost contracts as a result of MNPD's alleged control over the market of private security services that require POST-commissioned officers. Thus, Dr. Mathis's testimony offers little or no support for the market proposed that would be relevant to the claim at issue here. With no other evidence in the record to support the proposed definition, the district court correctly determined that the Companies failed to define a relevant market with the requisite precision.

### B. Monopoly Power

The second part of the threshold inquiry considers whether MNPD has monopoly power in the relevant market. Monopoly power is the defendant's power "to raise prices or to exclude competition when it . . . desired to do so." *Byars*, 609 F.2d at 850 (quoting *American Tobacco Co. v. United States*, 147 F.2d 93, 112 (6th Cir. 1944)). We recognize two ways in which a plaintiff can establish monopoly power for the purposes of attempted or actual monopolization. The first is to present direct evidence "showing the exercise of actual control over prices or the actual exclusion of competitors." *Id.*; *see also Flegel v. Christian Hosp. Northeast-Northwest*, 4 F.3d 682, 688 (8th Cir. 1993) ("'[P]roof of actual detrimental effects, such as reduction of output,' can obviate the need for an inquiry into market power, which is but a 'surrogate for detrimental effects.'" (quoting *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460–61 (1986)).

The second approach involves "presenting circumstantial evidence of monopoly power by showing a high market share within a defined market." *Re/Max Int'l, Inc.*, 173 F.3d at 1016.

Under that approach, famously employed by Judge Learned Hand in the seminal case *United States v. Aluminum Co. of America (Alcoa)*, 148 F.2d 416, 424, 429 (2d Cir. 1945), courts rely on economic analysis that estimates market share. *See Byars*, 609 F.2d at 850–51. Where market share can be estimated to be significant—usually upwards of 75% to 80%—courts find monopoly power exists and that the threshold inquiry has been satisfied. *Id.*

Though the Companies attempt to take both approaches to establish monopoly power, at trial, they relied primarily on the second approach. The district court found that the Companies failed to establish market share via the second approach because Dr. Mathis's study failed to conduct an inquiry into the relevant market: the sell-side of the private security market. And even regarding the market Dr. Mathis did analyze, he acknowledged that MNPD has only "'considerable market power,' not *monopoly* power." We agree with the district court that this fails to make the requisite showing needed to demonstrate monopoly power.

On appeal, the Companies urge us to consider the direct evidence on the record that "proved MNPD's exclusion of competition at dozens of locations throughout Davidson County, Tennessee," especially its ability to provide "free services." The Companies point is well-taken: this direct evidence may suffice to support an inference of monopoly power in some market. In *Byars*, we reached a similar conclusion—where the plaintiff proffered evidence that retailers received "inferior service at greater costs" it lent "strong support to plaintiff's contention that [the defendant] possesse[d] monopoly power." 609 F.2d at 853 n.26. Analogously, MNPD's offering of free services to several event organizers completely undercuts any possibility of competition and therefore excludes any private security company from being able to compete.

The problem here, however, is that without a properly defined market, it is unclear how much power MNPD exercises over the market at issue and whether that power, in fact, amounts

to monopoly power. Though there may be some evidence of monopoly power, without a precisely defined relevant market to contextualize the extent of MNPD's power, we cannot determine whether that power actually satisfies the standard for monopoly power. Accordingly, the district court did not err in holding that the Companies failed to prove, by a preponderance of the evidence, that MNPD possessed sufficient market share to infer monopoly power in the relevant market.

Because the Companies' claims fail on the threshold inquiries, we need not address and do not express a view on the remaining elements of a Section 2 claim of monopolization or attempted monopolization.

## III. CONCLUSION

For the reasons stated, we **AFFIRM** the district court's judgment.