[Cite as *Aegis, L.L.C. v. Schlorman*, 2024-Ohio-3325.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
GREENE COUNTY

| | | |
|---|---|---|
| AEGIS, LLC d/b/a EEJIS | : | |
| | : | |
| Appellant | : | C.A. No. 2024-CA-6 |
| | : | |
| v. | : | Trial Court Case No. 2022 CV 0377 |
| | : | |
| KEVIN SCHLORMAN, et al. | : | (Civil Appeal from Common Pleas |
| | : | Court) |
| Appellees | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on August 30, 2024

. . . . . . . . . . .

JOHN H. FORG, Attorney for Appellant

WILLIAM M. HARTER, Attorney for Appellee

. . . . . . . . . . . .

LEWIS, J.

{¶ 1} AEGIS, LLC appeals from a judgment of the Greene County Court of Common Pleas which granted summary judgment in favor of Kevin Schlorman, Michael Lewis, and Liberty Mutual Insurance Company. For the reasons that follow, we will affirm

the judgment of the trial court.

## I. Facts and Procedural History

{¶ 2} After working as an insurance adjustor, general contractor, and manager of a roofing and restoration company, Jon Higgins started AEGIS, LLC in 2013. The company was a third-party subcontractor that assisted restoration companies in their interactions with both insureds (for example, customers who have roof damage from a storm) and insurance companies (in this case, Liberty). AEGIS provided training for sales employees and managers of the restoration companies, double-checked the insurance companies' work to make sure they did not miss damage, provided supplemental estimates for storm damage and repairs, and then negotiated with the insurance company to facilitate the restoration. Higgins estimated that his company's behind-the-scenes work saved his clients significant time, freeing them up to work on other important aspects of their businesses, like sales.

{¶ 3} AEGIS did not, however, have any contractual relationship with the homeowner or insurance company and, very often, neither outside party was aware that it was involved at all. AEGIS employees held themselves out as employees of the restoration contractor, telling the insurance companies and homeowners that they were "with" the contractor or with the contractor's "estimation department." This practice, according to Higgins, bolstered the brand of the contractors in the eyes of the clients; if a client saw the claims and repairs processes going smoothly and efficiently, they would credit the restoration contractor.

{¶ 4} Since its start in 2013, AEGIS had been hired by dozens of contractors

(including, as pertinent to this case, American Siding & Roofing, Andrews Services, Empire Roofing, and Renegade Roofing) and had worked on many claims brought by homeowners against numerous insurance companies, including Liberty. Each time, AEGIS representatives held themselves out as employees of the restoration company. AEGIS's opaqueness changed, though, when Higgins accidently sent Liberty adjustor Kevin Schlorman a message from the wrong email address; instead of sending an email from his usual generic Gmail account, Higgins responded from his company address, Higgins@EEJIS.com. At some point, another Liberty adjustor, Michael Lewis, became aware of Higgins and AEGIS. Based on their understanding of the insurance policies, both Lewis and Schlorman informed Higgins that they would only work directly with the policy holders and/or their restoration contractors. Because AEGIS was not contracted by the homeowners, Lewis and Schlorman refused to work with the company on the four claims which were the focus of this case.

Peebles Claim

{¶ 5} On or about October 1, 2020, Mark and Elizabeth Peebles made a claim under their insurance policy for damage to their roof that resulted in wet spots in their master bedroom and master bathroom. The Peebles contracted with Andrews Services as the restoration contractor and, in turn, Andrews Services hired AEGIS. The Peebles did not contract with AEGIS. Schlorman was Liberty's adjustor on the claim. Acting in accordance with his understanding of the insurance policy, Schlorman explained to Higgins that he would not work with AEGIS and would instead only communicate with the Peebles and/or Andrews Services. In a June 25, 2021 email, Schlorman wrote:

Mr. Higgins,

We have had this conversation in the past and we are both aware of who you are and what you do. Once again, as we have stated in the past, we will work directly with the contractor, not a 3rd party for any negotiations. You're more than welcome to handle emailing the invoice to us and we can reach out to the contractor if there are any issues.

Schlorman Aff. at ¶ 6; Exhibit A-2.

**{¶ 6}** There was no more direct contact between Higgins and Schlorman, but Higgins created the estimate and gave Joseph Lehman (Andrews Services's sales manager) "guidance of how [he] should word things." Lehman Depo. at 42. Higgins also drafted emails to Liberty and had Lehman send them on behalf of Andrews Services. Lehman still used AEGIS and Higgins, he just had to do a little more legwork. Lehman Depo. at 25-26.

West Claim

**{¶ 7}** David and Amanda West made a policy claim for hail damage on June 18, 2021. The Wests engaged American Siding & Roofing as their contractor, which in turn subcontracted with AEGIS. Schlorman was Liberty's adjustor. According to the affidavit of American project manager Brad Ireland, Schlorman "indicated he would not deal with Mr. Higgins or AEGIS directly; instead, Liberty Mutual would only deal with contractors hired directly by Mr. West, meaning American or myself." Ireland Aff. at ¶ 2-8.

**{¶ 8}** Ultimately, neither American nor AEGIS completed the claim.

Campbell Claim

{¶ 9} On or about December 11, 2021, Gail Campbell made a claim with Liberty for tornado damage to her property. Renegade Roofing was hired as the restoration contractor, and Schlorman was Liberty's adjustor. Upon learning that AEGIS was working for Renegade Roofing, Schlorman sent an email to Higgins and Tyler Slone, Renegade's owner, reiterating that it was Liberty's policy that he only communicate with the insured or the contractor:

> Thanks for this, but per the contract, we can deal with the contractor directly. Yes, every contractor will send over the signed contract, so we know who we can work with. I do not show your outfit listed on the contract. Since the contractor hired you as a 3rd supplement firm, they will be able to work with you separately per your agreement with them.
>
> I am more than happy to deal with the contractor directly as our insured hired them. If you have a signed contract with our insured and your company, please send that over and we can review it. We are here to do what is best for our insureds and work with the legal parties they hired to do the work.

Schlorman Aff. at ¶ 12; Exhibit 4.

{¶ 10} Slone responded that Renegade had "contracted [AEGIS] to handle all of our estimation and supplement processing" and requested that Schlorman deal directly with AEGIS regarding the Campbell claim. Schlorman did not believe that, according to the policy, it was enough for Renegade to request that he work with Higgins. He

responded:

> I certainly understand you hired [AEGIS] for supplements and that would be a contract between you and them. If the insured hired them, they would have a contract [then we can] work with that outfit and our insured to get them whole. We only work directly with the contractor that our insured hired.
>
> Since you hired a 3rd party to charge supplements on the claim that would be something within your business model and they would communicate directly with you not us. We will continue to work directly with you per the contract with our insured. We do not deal with 3rd parties unless they have a signed contract with our insured, then we will deal directly with that third party.

Schlorman Aff. at ¶ 15; Exhibit 4.

{¶ 11} Despite the lack of communication between AEGIS and Liberty, the claim was completed, and AEGIS was paid. Dorian Depo. at 34, 36.

<u>Odle Claim</u>

{¶ 12} On or about July 6, 2022, Joseph Odle submitted an insurance claim to Liberty for roof damage. He thereafter hired Empire Roofing to do the restoration work on his property. Neither Schlorman nor Lewis was the assigned insurance adjustor working the case, but when Liberty became aware that an AEGIS employee was contacting the insurance company, Lewis sent a letter to Empire that stated:

> [P]lease be advised that Liberty Mutual does not have an obligation to

discuss this claim or its estimate with anyone but the contractor and our name insured. This letter sets forth and shall serve as Liberty Mutual's position regarding this claim, based on current information, Liberty Mutual, therefore, will not respond to further inquiries from anyone but the contractor and our named insured.

Lewis Aff. at ¶ 6; Exhibit 2.

{¶ 13} Empire's owner wrote back, explaining that he had contracted with AEGIS to help perform quality control checks and had given AEGIS permission to speak on his behalf. Nevertheless, Lewis and Liberty did not relent as "AEGIS and/or Empire Roofing never presented Liberty with any contract between AEGIS and the insured." Lewis Aff. at ¶ 7.

{¶ 14} Based on these four instances, AEGIS filed suit against Schlorman, Lewis, and Liberty. The initial complaint was filed on July 14, 2022, and a second amended complaint was filed on March 17, 2023. The lawsuit featured two counts. Count One alleged that Schlorman and Liberty had intentionally interfered with AEGIS's business relations with American Siding & Roofing, Andrews Services, and Renegade Roofing & Restoration. Count Two claimed that Lewis and Liberty had intentionally interfered with AEGIS's business relations with Empire Roofing. AEGIS further alleged that it had suffered damages in excess of $25,000 as a result of the interference.

{¶ 15} After months of motion practice. AEGIS filed a motion for summary judgment on June 6, 2023, which the court denied.   On November 1, Schlorman, Lewis, and Liberty filed a motion for summary judgment. The trial court granted this motion,

reasoning that the language of the insurance policy did "not place any obligation upon the insurer, Liberty, to communicate with any entity regarding adjustment of a loss other than . . . the named insured or insureds." Summary Judgment Entry at 7. It further found that the defendants had "simply declined to participate in [AEGIS]'s business model." *Id.*

**{¶ 16}** AEGIS filed a timely appeal, raising a single assignment of error.

## II.      Intentional Interference with Business Relationships

**{¶ 17}** AEGIS contends that the trial court erred by granting summary judgment in favor of Schlorman, Lewis, and Liberty.

**{¶ 18}** Pursuant to Civ.R. 56(C), a movant is entitled to summary judgment when that party demonstrates that there is (1) no issue as to any material fact; (2) that the moving party is entitled to judgment as a matter of law; and (3) that reasonable minds can come to only one conclusion, and that conclusion is adverse to the non-moving party. *Rhododendron Holdings, LLC v. Harris*, 2021-Ohio-147, ¶ 22 (2d Dist.).

**{¶ 19}** "The burden of demonstrating that no genuine issues exist as to any material fact falls upon the moving party requesting a summary judgment." *Harless v. Willis Day Warehousing Co., Inc.*, 54 Ohio St.2d 64, 66 (1978). Once the moving party has satisfied its burden of showing that there is no genuine issue of material fact, the burden shifts to the non-moving party to set forth specific facts showing a genuine issue for trial. *Dresher v. Burt*, 75 Ohio St.3d 280, 293 (1996). The non-moving party cannot rely upon the mere allegations or denials in the pleadings but must give specific facts showing that there is a genuine issue for trial. Civ.R. 56(E). *Accord Geloff v. R.C. Hemm's Glass Shops, Inc.*, 2021-Ohio-394, ¶14 (2d Dist.). When the standard is met, summary

judgment must be awarded as a matter of law.

{¶ 20} AEGIS alleged tortious interference with a business relationship. That tort occurs when a person (or entity), without privilege to do so, induces or otherwise purposefully causes a third person not to enter into or continue a business relationship with another. *Gentile v. Turkoly*, 2017-Ohio-1018, ¶ 24 (7th Dist.). It does not require the breach of a contract; rather, it is enough to prove that a third party did not enter into or continue a business relationship with the plaintiff. *Id*; *see also Sacksteder v. Senney*, 2012-Ohio-4452, ¶ 78 (2d Dist.) (tortious interference with a business relationship includes intentional interference with prospective contractual relations, not yet put into a contract).

{¶ 21} " 'The elements essential to recovery for a tortious interference with a business relationship are: (1) a business relationship; (2) the wrongdoer's knowledge thereof; (3) an intentional interference causing a breach or termination of the relationship; and (4) damages resulting therefrom.' " *Schlaegel v. Howell,* 2015-Ohio-4296, ¶ 31 (2d Dist.), quoting *Kademian v. Marger,* 2012-Ohio-962, ¶ 93 (2d Dist.).

{¶ 22} In this case, it was clear that AEGIS and the previously-named restoration companies had contracts and that Schlorman and Lewis knew about them. The stumbling block for AEGIS, however, was the third element: whether there was an intentional interference that caused a breach or termination of that relationship. There was simply no evidence that there was a breach or termination of their relationships.

{¶ 23} In his deposition, Higgins, AEGIS's principal, testified that his company was still working with the restoration companies. Higgins Depo. at 99, 120. This testimony was

supported by depositions from the restoration companies, too. Joseph Lehman, a project manager for Andrews Services, stated that even in the Peebles claim, when Liberty had refused to work with Higgins, he had used AEGIS. Further, Higgins admitted that even in cases in which Schlorman and Lewis were involved, their actions did not affect AEGIS's ability to prepare estimates; he would just have to have Higgins prepare it and then send it to the insurance company himself.

{¶ 24} Theodore Dorian, the operations manager at Renegade Roofing, testified that despite the lack of communication between AEGIS and the insurance company during the Campbell claim, the job was completed and AEGIS got paid. He further stated that he had not stopped working with AEGIS and had no intention to do so. Dorian Depo. at 34. Similarly, Brad Ireland, the project manager at American Roofing & Siding, testified that he still worked with AEGIS and had no intention to stop. Ireland Depo. at 13.

{¶ 25} Further, Higgins testified that Andrews Services, American Roofing & Siding, and Empire Roofing all had open claims with AEGIS. Higgins Depo. at 99, 111, 120.

{¶ 26} AEGIS did not show that it lost any future business either. The following deposition exchanges drove home the point.

Attorney: Are there specific contractors that you would like to work with that you were unable to work with because of any action by Liberty or Schlorman or Lewis?

Higgins: No.

Attorney: Are there any specific jobs or claims that you would like to work

on or have planned to work on that you were unable to do so because of Liberty or Schlorman or Lewis?

Higgins: No.

Higgins Depo. at 181. Higgins was later asked: "Do you have any knowledge of any circumstances where you have been prohibited from getting a job based on any action by Liberty, Schlorman or Lewis?" He again answered, "No." Higgins Depo. at 183.

{¶ 27} AEGIS attempted to satisfy this element by claiming that it had started losing future business. In his second affidavit, filed in response to Schlorman, Lewis, and Liberty's motion for summary judgment, Higgins posited that Ireland, the project manager for American Siding & Services, had informed him that he would not hire AEGIS on future claims with Schlorman as adjustor because his involvement would create "unavoidable issues."

{¶ 28} This assertion, however, was hearsay, as it was "a statement, other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Absent an exception, hearsay may not be considered in a motion for summary judgment, and we may not consider it on appeal. *Johnson v. Southview Hosp.,* 2012-Ohio-4974, ¶ 20 (2d Dist.), citing *Knoth v. Prime Time Marketing Mgt., Inc.,* 2004-Ohio-2426, ¶ 13 (2d Dist.) ("It is fundamental that the evidence offered by affidavit in support of or in opposition to a motion for summary judgment must also be admissible at trial, albeit in different form, in order for the court to rely on it."). We find that this statement did not fall under any hearsay exception and hold that the assertion was inadmissible.

{¶ 29} Even if it had been admissible under some hearsay exception, the affidavit did not create a genuine issue of material fact, as it contradicted Higgins's previous deposition testimony that there were no impediments to his business relationships with American Siding & Services. *See Byrd v. Smith*, 2006-Ohio-3455, ¶ 28 (where an affidavit is inconsistent with the affiant's prior deposition testimony as to the material facts, and the affidavit neither suggests affiant was confused at the deposition nor offers a reason for the contradiction, the affidavit does not create a genuine issue of material fact which would preclude summary judgment); *Bailey v. Topline Restaurants, Inc.*, 2012-Ohio-1759, ¶ 25 (10th Dist.) (excluding an affidavit from summary judgment consideration because the non-moving party's affidavit "completely contradict[ed] his deposition testimony.").

{¶ 30} AEGIS did meet the third element for tortious interference with a business relationship, and therefore the trial court did not err in concluding that its claim failed. But more fundamentally, the claim failed for a different reason: parties have the freedom to do business with whomever they choose.

{¶ 31} Except in the limited context of monopolies, there is a "liberty-based assumption that individuals and companies may do business with whomever they please." *St. Luke's Hosp. v. ProMedica Health Sys., Inc.*, 8 F.4th 479, 486 (6th Cir. 2021). As a general rule, businesses have the freedom to choose the parties with whom they deal, the prices that are set, and the terms and conditions of the deal. *Pac. Bell Tel. Co. v. LinkLine Comms., Inc.*, 555 U.S. 438, 448 (2009). Even the Sherman Antitrust Act "does not restrict the long recognized right of trader or manufacturer engaged in an

entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919).

**{¶ 32}** Here, according to the insurance policies, Liberty (and by extension Schlorman and Lewis) was contractually obligated to deal with the insureds and no one else. The unambiguous language of the policy stated that Liberty would "adjust all losses with *you,*" and then defined "you" as the "named insured"; and if a resident of the same household: the spouse, civil partner, or domestic partner. (Emphasis added.) That meant it had to work with the Peebles, Odles, Campbells, and Wests, but no one else. It had no obligation to AEGIS whatsoever.

**{¶ 33}** As the trial court noted, "[AEGIS]'s business model depends upon insurance carriers' voluntary cooperation with [AEGIS] in negotiating on behalf of contractors hired by the named insureds. But [AEGIS] does not cite to any evidence in the record or to any law that such cooperation is anything other than voluntary." Summary Judgment Entry at 7. Schlorman, Lewis, and Liberty simply decided not to participate in AEGIS's business model and had no obligation to do so. The assignment of error is overruled.

### III. Conclusion

**{¶ 34}** The judgment of the trial court will be affirmed.

. . . . . . . . . . . . .


EPLEY, P.J. and HUFFMAN, J., concur.